# UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF LOUISIANA

### MONROE DIVISION

| | | |
|---|---|---|
| **JUSTIN DAVID SIMMONS** | * | **CIVIL ACTION NO.  15-1673** |
| **VERSUS** | * | **JUDGE ROBERT G. JAMES** |
| **CAROLYN W. COLVIN, ACTING COMMISSIONER, SOCIAL SECURITY ADMINISTRATION** | * | **MAG. JUDGE KAREN L. HAYES** |

## REPORT AND RECOMMENDATION

Before the court is plaintiff's petition for review of the Commissioner's denial of social security disability benefits.  The district court referred the matter to the undersigned United States Magistrate Judge for proposed findings of fact and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and (C).  For the reasons assigned below, it is recommended that the decision of the Commissioner be **REVERSED and REMANDED for further proceedings.**

## Background & Procedural History

On August 28, 2012, Justin David Simmons protectively filed the instant applications for Title II Disability Insurance Benefits and Title XVI Supplemental Security Income payments. (Tr. 149-158).[1]  He alleged disability as of August 28, 2012, because of a seizure disorder and injuries from a fall.  (Tr. 170, 174).  The state agency denied the claims at the initial stage of the administrative process.  (Tr. 60-107).   Thereafter, Simmons requested and received a hearing on October 10, 2013, before an Administrative Law Judge ("ALJ").  (Tr. 40-59).  In a March 24, 2014, written decision, the ALJ determined that Simmons was not disabled under the Act,

---

[1]  He filed a prior application on March 9, 2007, that was denied.  (Tr. 63).

finding at step five of the sequential evaluation process that he was capable of making an adjustment to work that exists in substantial numbers in the national economy.  (Tr. 20-35). Simmons appealed the adverse decision to the Appeals Council.  However, on March 24, 2015, the Appeals Council denied Simmons' request for review; thus the ALJ's decision became the final decision of the Commissioner.  (Tr. 1-3).

On May 11, 2016, Simmons filed the instant complaint for judicial review of the Commissioner's final decision.  He alleges the following errors,

1)      the ALJ erred at step two of the sequential evaluation analysis by failing to find that tuberous sclerosis was a severe impairment;

2)      for various reasons, the ALJ's residual functional capacity assessment regarding the effects of plaintiff's mental impairments is not supported by substantial evidence; and

3)      the ALJ improperly evaluated the materiality of plaintiff's substance abuse under Social Security Ruling 13-2p.

The matter is now before the court.

## **Standard of Review**

This court's standard of review is (1) whether substantial evidence of record supports the ALJ's determination, and (2) whether the decision comports with relevant legal standards.  *Villa v. Sullivan*, 895 F.2d 1019, 1021 (5th Cir. 1990).  Where the Commissioner's decision is supported by substantial evidence, the findings therein are conclusive and must be affirmed. *Richardson v. Perales*, 402 U.S. 389, 390 (1971).  The Commissioner's decision is not supported by substantial evidence when the decision is reached by applying improper legal standards. *Singletary v. Bowen*, 798 F.2d 818 (5th Cir. 1986).  Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  *Richardson v. Perales*, 402 U.S. at 401.  Substantial evidence lies somewhere between a scintilla and a

2

preponderance. *Muse v. Sullivan*, 925 F.2d 785, 789 (5th Cir. 1991). A finding of no substantial evidence is proper when no credible medical findings or evidence support the ALJ's determination. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988). The reviewing court may not reweigh the evidence, try the issues *de novo*, or substitute its judgment for that of the Commissioner. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994).

### Determination of Disability

Pursuant to the Social Security Act ("SSA"), individuals who contribute to the program throughout their lives are entitled to payment of insurance benefits if they suffer from a physical or mental disability. *See* 42 U.S.C. § 423(a)(1)(D). The SSA defines a disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A). Based on a claimant's age, education, and work experience, the SSA utilizes a broad definition of substantial gainful employment that is not restricted by a claimant's previous form of work or the availability of other acceptable forms of work. *See* 42 U.S.C. § 423(d)(2)(A). Furthermore, a disability may be based on the combined effect of multiple impairments which, if considered individually, would not be of the requisite severity under the SSA. *See* 20 C.F.R. § 404.1520(a)(4)(ii).

The Commissioner of the Social Security Administration has established a five-step sequential evaluation process that the agency uses to determine whether a claimant is disabled under the SSA. *See* 20 C.F.R. §§ 404.1520, 416.920. The steps are as follows,

(1)     An individual who is performing substantial gainful activity will not be found disabled regardless of medical findings.

(2)     An individual who does not have a "severe impairment" of the requisite

3

duration will not be found disabled.

(3)      An individual whose impairment(s) meets or equals a listed impairment in [20 C.F.R. pt. 404, subpt. P, app. 1] will be considered disabled without the consideration of vocational factors.

(4)      If an individual's residual functional capacity is such that he or she can still perform past relevant work, then a finding of "not disabled" will be made.

(5)      If an individual is unable to perform past relevant work, then other factors including age, education, past work experience, and residual functional capacity must be considered to determine whether the individual can make an adjustment to other work in the economy.

*See Boyd v. Apfel*, 239 F.3d 698, 704 -705 (5th Cir. 2001);  20 C.F.R. § 404.1520.

The claimant bears the burden of proving a disability under the first four steps of the analysis; under the fifth step, however, the Commissioner must show that the claimant is capable of performing work in the national economy and is therefore not disabled. *Bowen v. Yuckert*, 482 U.S. 137, 146 n. 5 (1987).  When a finding of "disabled" or "not disabled" may be made at any step, the process is terminated. *Villa v. Sullivan*, 895 F.2d 1019, 1022 (5th Cir. 1990).  If at any point during the five-step review the claimant is found to be disabled or not disabled, that finding is conclusive and terminates the analysis. *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

### The ALJ's Findings

**I.      Steps One, Two, and Three**

The ALJ determined at step one of the sequential evaluation process that the claimant did not engage in substantial gainful activity during the relevant period.  (Tr. 25)  At step two, he found that the claimant suffered severe impairments of depressive disorder, generalized anxiety disorder, obsessive-compulsive disorder, seizure disorder, vision loss of the left eye, and history

4

of alcohol abuse.  (Tr. 25-26).[2]   The ALJ further determined that the claimant's impairments, *including substance use disorder*, met listings 12.04, 12.06, 12.08, and 12.09 of 20 C.F.R. Part 404, Subpart P, Appx 1 (20 C.F.R. §§ 404.1520(d) and 416.920(d)), at step three of the process. *Id*.  However, if the claimant stopped the substance abuse, then his impairments would not be severe enough to meet or medically equal any of the impairments listed in Appendix 1, Subpart P, Regulations No. 4.  (Tr. 29-30).

## II.      Residual Functional Capacity

The ALJ next determined that, if the claimant stopped the substance abuse, he would have the residual functional capacity ("RFC") to perform the full range of work at all exertional levels, subject to the following nonexertional limitations:  only occasional climbing of stairs/ramps and balancing, with the complete inability to climb ladders, ropes, or scaffolds; left eye blindness, with right eye correctable to normal; and the need to avoid all exposure to hazards. Mentally, he required no more than occasional contact with co-workers and the public; work that entails no more than understanding, remembering, and carrying out 1-2-3 instructions, with no production quotas; and "no more than necessary attention and concentration than for simple tasks that require little independent judgment and minimal variation."  (Tr. 30-34).

## III.     Steps Four and Five

The ALJ concluded at step four of the sequential evaluation process that Simmons was unable to perform his past relevant work.  (Tr. 34).  Accordingly, he proceeded to step five.  At this step, the ALJ determined that Simmons was a younger individual, with at least a high school education, and the ability to communicate in English.  (Tr. 34-35).  Transferability of skills was

---

[2]  The ALJ determined that Simmons' tubular sclerosis impairment was not severe because it did not cause serious limitations.  (Tr. 26).

immaterial.  *Id*.  The ALJ then observed that, given Simmons' vocational factors, and if he had: 1) stopped the substance abuse, and 2) retained an RFC that did not include any non-exertional limitations, then the Medical-Vocational Guidelines would direct a finding of not disabled.  20 C.F.R. § 404.1569; Rule 204.00, Appendix 2, Subpart P, Regulations No. 4.  *Id*.

However, because Simmons' RFC *did* include nonexertional limitations, the ALJ consulted a vocational expert ("VE") to determine whether, and to what extent his limitations eroded the occupational base for unskilled work at all exertional levels, in the absence of substance abuse.  *Id*.  In response, the VE identified the representative jobs of dining room attendant - medium, *Dictionary of Occupational Titles* ("DOT") Code # 311.677-01810; and sandwich maker - medium, DOT Code # 317.664-010 that were consistent with the ALJ's RFC and Simmons' vocational profile.  *Id*.[3]

## Analysis

## I.   Step Two

Plaintiff contends that the ALJ erred when he determined that his tubular sclerosis impairment was non-severe.  In assessing the severity of an impairment, the Fifth Circuit has determined that "an impairment can be considered as not severe only if it is a slight abnormality [having] such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education or work experience."  *Loza v. Apfel*, 219 F.3d 378, 391 (5th Cir. 2000) (citing *Stone v. Heckler*, 752 F.2d 1099, 1101 (5th Cir.1985)).

---

[3]   The VE testified that for the dining room attendant job, there were 134,994 positions nationally and 1,723 positions regionally.  (Tr. 35, 48-49).  For the sandwich maker job, there were 733,903 positions nationally and 27,650 regionally.  *Id*.  This incidence of work constitutes a significant number of jobs in the "national economy."  42 U.S.C. § 423(d)(2)(A); *Johnson v. Chater*, 108 F.3d 178, 181 (8th Cir. 1997) (200 jobs at state level and 10,000 nationally, constitute a significant number).

However, when, as here, the ALJ's analysis proceeds beyond step two of the sequential evaluation process, strict adherence to *Stone* and its requirements is not required.  *See Harrell v. Bowen*, 862 F.2d 471, 481 (5th Cir. 1988); *Chapparo v. Bowen*, 815 F.2d 1008, 1011 (5th Cir. 1987); *Jones v. Bowen*, 829 F.2d 524, n. 1 (5th Cir. 1987).  Once a severe impairment is determined to exist, all medically determinable impairments must be considered in the remaining steps of the sequential analysis.  *See* 20 C.F.R. § 416.945(a)(2).  Indeed, the ALJ recited the foregoing regulation, and proceeded to consider the medical record and the aggregate impact of plaintiff's impairments.  *See* Tr. 24-34, and discussion, *infra*.  The critical issue becomes whether the ALJ's residual functional capacity assessment is supported by substantial evidence.  Thus, while the ALJ likely should have found that tubular sclerosis was a severe impairment, any error was harmless, where, as here, the manifestations of tubular sclerosis were captured and assessed by the ALJ via plaintiff's other severe impairments – e.g., depressive disorder, generalized anxiety disorder, obsessive-compulsive disorder, seizure disorder, etc.

## II.   Residual Functional Capacity

### a)   Chronology of Relevant Medical Evidence

#### i)   Evidence Before the ALJ

Simmons was hospitalized from January 21-24, 2012, with diagnoses of nausea and vomiting, alcoholism, hypertension, and tubular sclerosis.  (Tr. 436-477).  He was hospitalized again from January 25-26, 2012, for recurrent nausea and vomiting.  (Tr. 405-435).  Dr. McHugh agreed with Dr. Joiner that his symptoms all could stem from alcohol withdrawal.  *Id*.

Simmons was hospitalized from March 13-14, 2012, with diagnoses of alcoholic gastritis, alcohol abuse, seizure disorder, and tuberous sclerosis.  (Tr. 288-302).  Renal ultrasound showed some lesions on his kidneys, but nothing on his liver.  *Id*.  It was noted that he drank about a pint

of vodka every day.  *Id*.  Gallbladder ultrasound showed gallbladder sludge and findings consistent with fatty infiltration of the liver.  *Id*.

Simmons went to the emergency room on July 20, 2012, with nausea and vomiting.  (Tr. 393-404).  He reportedly had ceased drinking two days earlier.  *Id*.  He was treated and discharged that same date.  *Id*.

Family Solutions Counseling records from June 20 and August 6, 2012, showed history of drinking, difficulty finding/staying employed, strained relationship with wife, recently released from rehab. for drinking, and history of living in multiple locations across the country.  (Tr. 310-315).  Simmons was tired of being told what to do, wanted his independence, had relationship issues with his wife, and felt that his parents did not understand him.  *Id*.  He reported difficulty reducing his alcohol consumption, and inability to manage anxiety well.  *Id*.  By August 13, 2012, he had reduced alcohol consumption to ½ pint of vodka per day.  *Id*.

Following a fall from a balcony, Simmons was hospitalized from August 18-29, 2012, with diagnoses of intra-cranial hemorrhage; multiple lacerations to his left head and knee; left orbital wall fracture; multiple abrasions; seizure disorder; tuberous sclerosis; and history of alcohol abuse.  (Tr. 319-392).  He was heavily intoxicated at the time.  *Id*.  CT scan of the head revealed a small hemorrhage in the sputum pellucidum and probable tiny cortical hemorrhages versus punctate diffuse axonal injury in the right frontal and temporal lobes.  *Id*.  CT scan of the abdomen and pelvis showed multiple bilateral solid renal masses.  *Id*.  Simmons stayed very confused during his ICU stay.  *Id*.  He was discharged to Caldwell Memorial Rehabilitation.  *Id*.  It was unclear whether a seizure or alcohol had caused his fall from the balcony.  *Id*.  Simmons regulated his OCD symptoms with alcohol use.  *Id*.  When he drank excessively, he experienced greater potential for seizure difficulties.  *Id*.  He described drinking a fifth of vodka every other

day.  *Id*.  He said that he had been drinking that heavily for many years.  *Id*.  Simmons did not

think that he purposefully jumped from the balcony.  *Id*.  His insight was limited; judgment poor;

memory was intact.  *Id*.  Russ Greer, M.D., diagnosed delirium due to closed head injury; alcohol

dependence; rule out alcohol withdrawal and alcoholic delirium; history of depression, major

depressive disorder versus substance-induced mood disorder.  *Id*.  He also had a history of

tuberous sclerosis.  *Id*.  Greer assigned a Global Assessment of Functioning ("GAF") score of

30.  *Id*.[4]

On September 20, 2012, Simmons was seen by Kathy Moore, a nurse practitioner.  (Tr.

515-516).  She diagnosed Simmons with seizure disorder and status post-head trauma.  *Id*.

On October 16, 2012, Simmons underwent a psychiatric consultation with Scott Zentner,

M.D.  (Tr. 522-523).  Simmons reported that he had no recall of his fall from the balcony, and

did not think that he was suicidal.  *Id*.  He had not had a seizure since the accident.  *Id*.  He stated

that he started drinking when he was 18.  *Id*. He drank daily, up to two fifths of vodka per day.

*Id*.  His average consumption was one fifth of vodka per day.  *Id*.  He attended college for two

years.  *Id*. Simmons appeared cooperative, adequately groomed, in no acute distress.  *Id*.  His

mood was good, but depressed.  *Id*.  He had no signs of psychosis.  *Id*.  He had fair insight, and

judgment, with intact impulse control.  *Id*.  Zentner diagnosed dysthymic disorder; generalized

anxiety disorder; OCD; alcohol dependence in remission; rule out amnestic disorder secondary to

---

[4] "GAF is a standard measurement of an individual's overall functioning level 'with respect only to psychological, social, and occupational functioning.'"  *Boyd*, 239 F.3d at 701 n.2 (citing AMERICAN PSYCHIATRIC ASS'N DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS at 32 (4th ed. 1994) (DSM-IV)).

A GAF of 21-30 is defined as "**[b]ehavior is considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment** (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) **OR inability to function in almost all areas** (e.g., largely incoherent or mute)."  DSM-IV, pg. 32.

traumatic brain injury; seizure disorder; tuberous sclerosis; and residual blindness in left eye.  *Id.*  Zentner remarked that Simmons appeared to have significant functional disability associated with injuries and preexisting medical conditions; his prognosis for future gainful employment was quite poor.  *Id.*

On November 12, 2012, Simmons saw David Boyle, Ph.D.  (Tr. 514).  He reported that he went to a detoxification hospital for seven days when he was 19 years old.  *Id.*  Simmons stated that he had a bad temper and was controlling.  *Id.*  He had been arrested three times for fighting and other problems when abusing alcohol.  *Id.*  Simmons stressed easily when others did not follow his instructions.  *Id.*  His last alcohol consumption was two months earlier.  *Id.*  Boyle diagnosed alcohol dependency in remission and generalized anxiety.  *Id.*

Simmons was hospitalized from November 15-20, 2012, with diagnoses by Alfredo Torres, M.D. of major depression, recurrent, severe, without psychosis; alcohol dependence; attention deficit disorder, adult; and personality disorder NOS.  (Tr. 618–620).  His GAF at discharge was 40.  *Id.*[5]  The police brought Simmons to the emergency room after Simmons' father called them when Simmons had threatened the family with violence, while intoxicated.  *Id.*  Simmons stated that he was going to end his life by overdosing on pills.  *Id.*  He continued to minimize the intensity of his addiction to alcohol.  *Id.*

Dr. Mallepalli, M.D., noted on November 15, 2012, that Simmons drank alcohol regularly.  (Tr. 621-623).  He did not work, however, because of his seizure disorder.  *Id.*

On November 15, 2012, a counselor noted on an assessment form that Simmons was able

---

[5]A GAF score of 31-40 denotes "**[s]ome impairment in reality testing or communication** (e.g., speech is at times illogical, obscure, or irrelevant) **OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood** (e.g., depressed man avoids friends, neglects family, and is unable to work . . .). DSM-IV, pg. 32.

to groom himself and maintain hygiene independently.  (Tr. 627-629).  He also was able to prepare basic meals, perform household tasks/cleaning, run errands, and shop for groceries.  *Id.*

A November 26, 2012, assessment for Monroe Behavioral Health Clinic, documented that one week earlier, Simmons had been admitted for treatment.  (Tr. 526-529).  He had been sober for three months and then relapsed.  *Id.*  He was experiencing adjustment issues and depression.  *Id.*  However, he was focusing on scripture and the Bible for help.  *Id.*  He believed that prayer would heal his eye, his mind, and his drinking problem.  *Id.*  The social worker diagnosed depression and assigned a current GAF of 40, with a high of 65 within the past year.[6]

Simmons attended group therapy sessions at Monroe Behavioral Health from November 27, 2012, through January 31, 2013, when his case was closed for non-compliance with treatment.  (Tr. 549-795).

On December 21, 2012, Simmons underwent a psychiatric interview with Ollie Carter, M.D.  (Tr. 530-532).  His chief complaints were depression, anxiety, and alcoholism.  *Id.*  However, he thought that his major problem was social anxiety.  *Id.*  He liked watching thought-provoking movies like JFK.  *Id.*  He remained active in the church.  *Id.*  His concentration was not great.  *Id.*  However, he was friendly, with fair eye contact.  *Id.*  He had no paranoia, delusions, audio/visual hallucinations, and no suicidal ideation/intent.  *Id.*  He could perform simple math, with intact immediate and delayed memory recall.  *Id.*  Cognitively, he also was intact.  *Id.*  His prognosis was fair to good.  *Id.*  Carter diagnosed depressive disorder NOS, with

---

[6]  A GAF score of 61-70 indicates "**[s]ome mild symptoms** (e.g., depressed mood and mild insomnia) **OR some difficulty in social occupational, or school functioning** (e.g., occasional truancy, or theft within the household), **but generally functioning pretty well, has some meaningful interpersonal relationships**."  *DSM-IV*, pg. 32.

anxious features, and adjustment disorder NOS.  *Id*.  He assigned a GAF of 50.  *Id*.[7]

On January 9, 2013, non-examining agency psychologist, Julia Wood, Ph.D., completed a mental residual functional capacity assessment, in which she found that Simmons' mental impairments caused him to suffer moderate limitations in his ability to understand and remember detailed instructions.  (Tr. 94-97).  Furthermore, his sustained concentration and persistence limitations caused him to suffer moderate limitations in his ability to work near others without being distracted by them.  *Id*.  Simmons' social interaction limitations caused moderate limitations in his ability to interact with the general public.  *Id*.  Wood opined that Simmons could remember and follow simple instructions involving two steps, but not retain or understand complex instructions.  *Id*.  He also could sustain attention for up to two-hour blocks of time when performing simple and routine work-related tasks.  *Id*.  His symptoms would not prevent him from sustaining the mental demands associated with the performance of simple routine tasks throughout an ordinary workday/workweek.  *Id*.  Simmons could accept respectful supervision and constructive criticism.  *Id*.

At the request of the state agency, Simmons underwent an examination on January 30, 2013, administered by consultative physician, David Hebert, M.D.  (Tr. 682-686).  Simmons admitted that his seizures were greatly aggravated by drinking.  *Id*.  He reported that he had done well with not drinking for the past six months.  *Id*.  He reported left and right knee pain.  *Id*.  He admitted to an obsessive-compulsive disorder and possible features of adult attention deficit disorder.  *Id*.  He reported great difficulty with concentration.  *Id*.  Upon examination, Hebert

---

[7]  A GAF of 41-50 denotes "**[s]erious symptoms** (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting ) **OR any serious impairment in social, occupational, or school functioning** (e.g., no friends, unable to keep a job)."  *Diagnostic and Statistical Manual of Mental Disorders*, Fourth Edition DSM-IV, p. 32.

diagnosed history of generalized seizure disorder and partial complex seizures which were well-controlled on medication – when he did not consume alcohol.  *Id*.  Simmons had not suffered a seizure for six months.  *Id*.  Simmons also had complete blindness in his left eye, and history of possible ADHD, obsessive-compulsive disorder, or mild depression.  *Id*.  Hebert noted that a psychological evaluation was in order.  *Id*.  Physically, Hebert saw no reason why Simmons could not perform routine walking, sitting, standing, carrying, and lifting for an eight hour day.  *Id*.  Furthermore, he appeared alert, coherent, and quite functional.  *Id*.

Simmons was in a good mood at his psychotherapy session on February 7, 2013.  (Tr. 748).  He explained that he stopped attending group therapy sessions because they talked about a "higher power" instead of God.  *Id*.  He said that he had been in recovery for almost three months.  *Id*.  He told the therapist that he wanted to attend college and obtain a degree in management.  *Id*.

At Simmons' March 4, 2013, psychotherapy session, he disclosed that he had been depressed about his wife and child.  (Tr. 797).  He developed his disagreeable personality from being bullied at school.  *Id*.  He liked to use his size to intimidate people.  *Id*.  He admitted to relapsing.  *Id*.  However, he was stable at that time.  *Id*.

On March 12, 2013, non-examining agency physician, Maria Pons, M.D., reviewed the record, and endorsed a physical residual functional capacity assessment indicating that Simmons was capable of work at all exertional levels, reduced by left-eye blindness and the need for seizure precautions.  (Tr. 750, 92-94).

Simmons was in a good mood at his April 2, 2013, psychotherapy session.  (Tr. 798).  He reported that he had relapsed one week earlier.  *Id*.  He was home alone, with some money, so he went on a three day binge.  *Id*.  He knew it was wrong, but did it anyway.  *Id*.  His family

continued to tell him what to do.  *Id*.  He reacquired his driver's license.  *Id*.  He explained that he wanted to go to culinary school in Dallas, but his family did not want him to do that or get a job until he finished appealing his SSI denial.  *Id*.  He was stable at the time.  *Id*.

At his May 14, 2013, psychotherapy session, Simmons reported that he had been drinking because it relaxed him. (Tr. 816).  He said that he felt suicidal last month.  *Id*.  He drank about one liter of vodka, once per week.  *Id*.  Simmons discussed his ability to manipulate people.  *Id*.

Simmons was angry at his May 31, 2013, psychotherapy session.  (Tr. 815).  He had had an argument with his mother.  *Id*.  He appeared smug as he explained his behavior towards his mother.  *Id*.  He wanted to go to Oregon to become a chef and kinesiologist, but his father said that he should stay near his daughter.  *Id*.  He has not been attending AA meetings.  *Id*.  He did not like being impulsive, angry, insecure, dishonest, vindictive, and controlling.  *Id*.

Simmons was hospitalized from August 18-23, 2013, with diagnoses for major depression, recurrent without psychotic features and generalized anxiety disorder.  (Tr. 831-844).  His admitting GAF score was 35; upon discharge, his GAF was 50.  *Id*.  As of August 19, 2013, his last seizure had been one year earlier.  (Tr. 835).  He lived alone, waiting for disability, but performing odd jobs.  *Id*.  He denied any weakness in his extremities.  *Id*.

Simmons underwent an assessment on September 10, 2013.  (Tr. 801-804).  The social worker noted that Simmons had his own transportation, prepared his own meals, and had no needs.  *Id*.  He was friendly and athletic.  *Id*.  He had some intrusive thoughts associated with OCD.  *Id*.  Critical judgment was intact.  *Id*.  He suffered from major depression and alcohol dependence.  *Id*.  Current GAF was 45, with high in the past year of 50.  *Id*.

On September 10, 2013, A. Gullapalli, M.D., noted that Simmons was doing better; he had been discharged from Glenwood Hospital, and was attending AA meetings.  (Tr. 812).  He

had good insight. *Id*.

In an October 3, 2013, To Whom it May Concern letter, neurologist, Lowery Thompson, M.D., wrote that Simmons had been a seizure patient of his for several years. (Tr. 817-818). His last visit had been in September 2013, (apparently for a sleep study) with his last seizure in August 2013. *Id*. Thompson noted that Simmons had difficulty in large groups. *Id*. Simmons worried that he said things that did not make sense. *Id*. He had difficulty following instructions, and could only follow one step commands. *Id*. He also had difficulty staying focused; experienced balance problems; unable to keep employment; difficulty sleeping; memory problems; unable to keep a checkbook; unable to follow written instructions; anger issues; and trouble with authority figures. *Id*. Thompson concluded that Simmons was impaired to the point where he was unable to perform any occupation for which he had background or training. *Id*. Moreover, vocational rehabilitation would not be successful. *Id*.

On December 19, 2013, the ALJ sent interrogatories to non-examining psychological consultant, Beth Maxwell, Ph.D. (Tr. 845-853). On December 29, 2013, Maxwell responded to the interrogatories by finding that Simmons suffered from major depressive disorder, severe; alcohol dependence, severe; personality disorder NOS, severe; and anxiety NOS, severe. *Id*. He met listing 12.09 due to chronic alcohol abuse from January 23, 2012, until September 10, 2013. (Tr. 847). She further noted that Simmons had failed to comply with prescribed treatment, which was reasonably expected to improve his condition. *Id*.

Maxwell also completed a mental medical source statement, finding that, for periods without alcohol use, Simmons experienced but mild limitations in his ability to understand, remember, and carry out simple instructions, or to make judgments on simple, work-related decisions. (Tr. 851-853). He also had moderate limitations in his ability to understand,

15

remember, and carry out complex instructions, make judgments on complex work-related

decisions, interact appropriately with the public, supervisors, and co-workers.  *Id*.  Finally, he

experienced mild limitations in his ability to respond appropriately to usual work situations and

to changes in a routine work setting.  *Id*.

ii)   Evidence before the Appeals Council

On January 16, 2015, Simmons underwent psychological testing for attention and related

problems with William McCown, Ph.D.  (Tr. 6-15).  He obtained an intelligence score within

normal limits.  *Id*.  Simmons did not meet the criteria for DSM-5 Autism Spectrum Disorder.

Simmons described a number of problematic personality traits that would be diagnosed as

Borderline Personality, but for his tuberous sclerosis complex ("TSC").  He was likely to be quite

emotionally labile, manifesting fairly rapid and extreme mood swings, and, in particular,

probably experienced episodes of poorly controlled anger.  *Id*.  Simmons appeared uncertain

about himself, his identity, about major life issues, and had little sense of direction or purpose in

life.  *Id*.  He had serious, obsessive theological concerns that may preoccupy him.  *Id*.  He was

quite impulsive, and prone to behavior likely to be self-harmful or self-destructive, such as those

involving alcohol and possibly other substance abuse.  *Id*.  He also could be at increased risk for

self-mutilation or suicidal behavior.  *Id*.  Recently, Simmons had been thinking about becoming a

preacher.  *Id*.  Simmons reported that he might have had a drinking problem in the past, but no

longer did.  *Id*.  He reported that his major problem was lack of direction.  *Id*.  McCown noted

that Simmons would need constant work-related supervision, which would be difficult, due to his

personality and tendency to see others as somewhat intrusive.  *Id*.  McCown diagnosed mild

neurocognitive disorder stemming from Tuberous Sclerosis Complex and alcohol use disorder,

moderate.  *Id*.  McCown did not see Simmons as capable of prolonged employment in a

competitive capacity.  *Id*.  Simmons did not have sufficient attentional resources and did not possess the cognitive control to be supervised.  *Id*.  Until he made some progress, he was not likely to have workplace success.  *Id*.

b)    Discussion

In his decision, the ALJ reviewed the available evidence, including the hearing testimony, plaintiff's activities of daily living, treatment records, the impressions of plaintiff's treating physicians, the consultative physician, and the assessment of the non-examining agency psychologists.  (Tr. 26-34).  In deriving plaintiff's RFC, the ALJ resolved the opinion evidence as follows,

> [a]s for the opinion evidence, Dr. Hebert's opinion is afforded great weight, as the claimant has normal neurological function, normal organ function, and normal gait and mobility.  Dr. Thompson's opinion is afforded little weight, as the totality of the evidence does not support his conclusion.  Further, the issue of disability is reserved to the Commissioner.  While the claimant has described the difficulties set forth by Dr. Thompson, the evidence shows he has normal vision in the right eye, he has normal coordination and is not prone to falls except when drunk, and he demonstrated only mild memory problems on examinations.  Dr. Zetner's [sic] opinion the claimant has significant functional disability and poor prognosis for future gainful employment is afforded little weight.  Dr. Zetner's [sic] own mental status examination was unremarkable.  He did not observe any significant deficits in mood, affect or memory.  He noted he seemed of average intelligence, and he engaged easily and well with the examiner . . . As his alcohol use decreased, so did depressive symptoms and seizures.  The opinion of a Medical Expert recognized by the Commissioner is consistent with this conclusion (Exhibit 23F).

Plaintiff contends that the ALJ improperly discounted the opinions of his treating and/or examining physician/psychologists, Drs. Thompson, Zentner, Carter, and Gullipalli.  Indeed, although "the ALJ is free to reject the opinion of any physician when the evidence supports a contrary conclusion,"[8] the ALJ cannot reject a medical opinion without an explanation supported

---

[8]  *Martinez v. Chater*, 64 F.3d 172, 175-76 (5th Cir.1995) (citation and internal quotation marks omitted).

by good cause.  *See Loza v. Apfel*, 219 F.3d 378, 395 (5th Cir.2000) (citations omitted).

Here, most of the statements by the treating or examining physicians/psychologist do not reflect the limitations imposed by plaintiff's impairments, but instead implicate the ultimate issue of disability.  Accordingly, they are not accorded any special significance under the regulations. *See* 20 C.F.R. § 404.1527(e)(1); *Frank v. Barnhart*, 326 F.3d 618 (5th Cir. 2003).

One notable exception, however, is Dr. Thompson's impression that Simmons could follow only one-step commands, and that he experienced trouble with authority figures.  (Tr. 817-818).  The former limitation conflicts with Dr. Maxwell's opinion that Simmons could perform simple and detailed work, and with Dr. Wood's opinion that Simmons could follow two-step instructions.  (Tr. 852, 96-97).

This incongruity between the opinions of the examining and non-examining physicians/psychologists is troublesome because it is manifest that the ALJ relied on the opinions of the non-examining psychologists, Drs. Wood and Maxwell, in formulating his RFC. However, it is axiomatic that "an ALJ may properly rely on a non-examining physician's assessment when . . . those findings are based upon a careful evaluation of the medical evidence and *do not contradict those of the examining physician*." *Carrier v. Sullivan*, 944 F.2d 243, 246 (5th Cir.1991) (quoting, *Villa v. Sullivan,* 895 F.2d 1019,1024 (5th Cir. 1990)) (emphasis added).[9] Therefore, the ALJ was not permitted to rely on the opinions of the non-examining psychologists

---

[9]  Also, a non-examining physician/psychologist's opinion does not provide good cause for an ALJ to discount the findings of an examining physician.  *See Lamb v. Bowen*, 847 F.2d 698, 703 (11th Cir. 1988) (addressing ALJ's reliance upon non-examining physician's opinion to discount findings of treating physician). The Fifth Circuit cited *Lamb* for the proposition that the reports of non-examining physicians do not provide substantial evidence when the non-examining physician's medical conclusions "contradict or are unsupported by findings made by an examining physician." *Villa, supra* (citing, *Lamb, supra*; and *Strickland v. Harris*, 615 F.2d 1103, 1109-10 (5th Cir. 1980)).

18

where they conflict with those of the examining physicians.

Furthermore, the ALJ did not include all of the limitations recognized by Drs. Wood and Maxwell.  Specifically, Dr. Wood noted that Simmons' interaction with co-workers *and* supervisors would need to be limited to non-confrontational situations, with respectful supervision and constructive criticism.  (Tr. 97).  Similarly, Dr. Maxwell indicated that Simmons would experience difficulty working with supervisors, in addition to co-workers and the general public.  (Tr. 852).  The ALJ's RFC, however, did not include any limitations relating to supervisors.  Accordingly, the court is compelled to find that the ALJ's residual functional capacity assessment is not supported by substantial evidence.[10]

The court further observes that plaintiff supplemented the record before the Appeals Council with the results of psychological testing administered on January 16, 2015, by William McCown, Ph.D.  This evidence constitutes part of the instant record – provided that it is new, material and related to the period before the ALJ's decision.  *See Higginbotham v. Barnhart*  405 F.3d 332 (5th Cir. 2005); 20 C.F.R. § 404.970(b).[11]  There is little question that the additional evidence meets the applicable criteria.  The medical source statement is certainly new.  Although the Appeals Council purported to discount the assessment because it post-dated the relevant

---

[10]  Plaintiff confirmed that he had trouble with authority figures, and could follow only "one" instruction at a time.  (Tr. 237-238).  For future reference, it is worth noting that, in his letter, Dr. Thompson apparently endorsed or merely echoed plaintiff's self-described limitations. (Tr. 237-238).

[11]  *Higginbotham* cited *Perez v. Chater*, and *Wilkins v. Sec'y Dept. of Health Human Servs.* as support for its finding that post-ALJ evidence is to be considered part of the record. *See, Higginbotham*, 405 F.3d at fn. 3 (*citing inter alia*,  *Perez v. Chater*, 77 F.3d 41, 44–45 (2d Cir.1996) and *Wilkins v. Sec'y, Dept. of Health Human Servs.*, 953 F.2d 93, 96 (4th Cir.1991) (*en banc*)).  Both *Perez* and *Wilkins* require that the subsequent evidence be new, material and relevant to the pre-ALJ decisional period.  *Perez, supra*; *Wilkins, supra* (citing, 20 C.F.R. § 404.970(b)).

19

period, *see* Tr. 2, there is no indication that Simmons' condition significantly deteriorated between March 24, 2014, and January 16, 2015.  Rather, the assessment documented the mental health effects of plaintiff's congenital tuberous sclerosis complex.  In particular, Dr. McCown opined that Simmons would require constant work-related supervision, which would be challenging because of Simmons' tendency to see others as intrusive.  Therefore, Dr. McCown's assessment is relevant to the period at issue and material.  It serves to further undermine the ALJ's RFC.

**III.    Step Five**

Because the foundation for the Commissioner's step five determination was premised upon a residual functional capacity assessment that is not supported by substantial evidence, the court further finds that the Commissioner's ultimate conclusion that plaintiff is not disabled also is not supported by substantial evidence.[12]

<u>Conclusion</u>

For the above-stated reasons,

IT IS RECOMMENDED that the Commissioner's decision be REVERSED and REMANDED pursuant to the fourth sentence of 42 U.S.C. § 405(g) for further proceedings consistent herewith.

Under the provisions of 28 U.S.C. §636(b)(1)(C) and FRCP Rule 72(b), the parties have **fourteen  (14) days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court.  A party may respond to another party's objections within **fourteen (14) days** after being served with a copy thereof.  A courtesy copy of any objection or response or request for extension of time shall be furnished to the District Judge at the time of

---

[12]    The court need not reach plaintiff's remaining assignment(s) of error.

filing.  Timely objections will be considered by the District Judge before a final ruling issues.

A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN FOURTEEN (14) DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.

In Chambers, at Monroe, Louisiana, this 31st day of May 2016.

KAREN L. HAYES
UNITED STATES MAGISTRATE JUDGE